# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| CAROLYN ANN BURDETTE, ) | |
| ) | |
| Movant, ) | NO. 3:04-0232 |
| ) | JUDGE HAYNES |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent. ) | |

## M E M O R A N D U M

Movant, Carolyn Ann Burdette, filed this motion to vacate her conviction under 28 U.S.C. § 2255. Movant asserts claims for ineffective assistance of counsel at her trial, the Government's violation of Brady v. Maryland, 363 U.S. 83 (1963) and sentencing error based upon Booker v. United States, 543 U.S. 220 (2005). Movant's specific claims are that: (1) her counsel was ineffective for his failure to obtain crucial impeachment evidence about Steve Adams's personality disorder; (2) the Government's failure to disclose material on Adams's personality disorder; and (3) that under Booker, she is entitled to a new sentencing hearing with advisory sentencing guidelines. The United States filed its response. The Court appointed the Federal Public Defender to represent the Movant. An evidentiary hearing was held. Set forth below are the Court's findings of fact and conclusions of law.

### A. Procedural History

Movant was charged in a two count indictment with conspiracy to cause another individual to travel in interstate commerce with the intent that murder be committed and with a promise to pay the individuals. United States v. Burdette, 3:00-cr-00200. The indictment alleged the use of an interstate facility, a telephone, with the intent that a murder be committed

for a promise to pay in this District. Movant's conviction arose out of an investigation in November 2000, that occurred on the Tennessee side of Fort Campbell, Kentucky, a military base that revealed Staff Sergeant Stephen Adams solicited Michael Myott, a fellow service member, to murder Movant's husband. Movant and Adams had a romantic relationship. At that time, Myott and Adams were members of a Headquarters Company at Fort Campbell. Movant had been an instructor of the scout sniper school.

After pretrial proceedings, a jury trial was held on November 27-29, 2001 after which Movant was found guilty on both counts. Id. at Docket Entry No. 40. On July 8, 2002, Movant was sentenced to 151 months of imprisonment and five (5) years supervised release. Id. at Docket Entry No. 71: Judgment in a Criminal Case. On July 11, 2002, Movant filed her timely notice of appeal and on appeal, the Sixth Circuit affirmed.

## B. Findings of Fact

### 1. Trial Record

At Movant's trial, Adams testified as a government witness after his guilty plea and sentencing to a similar charge in a military proceeding. At Movant's trial, Adams admitted his romantic relationship with Movant that first ended in 1995. (Trial Transcript, November 28, 2001 at pp. 62-63). From 1996-1998, Movant sent letters to Adams about her husband's abuse of her. Adams interpreted some of the letters to mean that Movant wanted Randy Burdette, her husband, killed. Id. at p. 140. Adams traveled to Reedy, West Virginia three times in 1998 and in August and October of 1999. Id. at pp. 138-39. On two of those trips, Adams attempted to arrange to kill Randy Burdette. Id. at pp. 117-119.

On November 17, 2000, Adams made his last call to Movant and told her "I think I found

2

someone who can help us out, hold on honey, things are getting set. Just hang on, hang on." Id. at pp. 137-38. At trial, Adams testified that he "probably maybe" spoke to Movant in April 2000 for description of her husband and his vehicles. Id. at p. 128. At that time Adams hired a "Mr. Dodd" to kill Movant's husband. Id. at pp. 120-21. At trial, Movant's defense was that she was a victim of Adams and that she never intended or wanted to have her husband killed. (Transcript, November 28, 2001 pp. 162-227 and November 29, 2001 at pp. 4-40).

## 2. The Section 2255 Hearing

At the evidentiary hearing in this action, Movant submitted the July, 2001 testimony of Joan Schleicher, Ph.D., a psychologist who evaluated Adams and testified at Adams's sentencing hearing at Fort Campbell, Kentucky, prior to Movant's trial. According to Dr. Schleicher, Adams was a loner and suffered from a schizoid affective personality disorder. (Movant's Exhibit 1D, at p. 189). A symptom of this disorder is that Adams had his own "real internal world." Thus, Adams's "reality testing and [] judgment," or "his ability to weigh what [was] happening in his relationship with Burdette, or what [was] not happening in his relationship with her" was "dysfunctional." Id. at pp. 189-90. Dr. Schleicher's psychological testing reflected that Adams "has deep delusional beliefs about his role in the world." Id. at p. 193 (emphasis added). Dr. Schleicher opined that Adams "has an inner world of imagination that's very active and the problem with this is because he was alone so much of the time, it was not tested, it was not reality checked." Id. at p. 195.

As to Movant, Adams "was so connected to [Movant] in his fantasy of what she was that he couldn't step back and look at it." Id. at p. 199. According to Dr. Schleicher, Adams viewed himself as "being the [Movant's] savior, being the rescuer, which Caroline tapped into his falling

Case 3:04-cv-00232 Document 57 Filed 06/24/09 Page 3 of 12 PageID #: 235

in love with her." Id. at p. 83. Adams "perceived Caroline to be in imminent danger and perceived himself as the rescuer." Id. at p. 94. Dr. Schleicher quoted portions of Movant's letters to Adams to underscore the opinion. Id. at p. 198.

> She sends him cards as well as her own words,... like, "When I see your face, I see a 'man who has so much depth." And, he probably yearned to have depth instead of emptiness. "Your face reflects a bitter sweet pas and holds so much hope for the future. It's an honest and trusting face." All these words - - "with a boyish quality." All of these words would make him feel so full. It's almost like milk to a baby.

Id.

Yet, Dr. Schleicher also found that Adams could distinguish right from wrong, id. at 204 and could form the intent to kill. Id. at p. 220. Adams did not suffer from hallucinations. Id. at 204-05. According to Dr. Schleicher, Adams's "lack of having these relationships before left him really unprepared for the <u>seasoning of manipulation and cunning and life experience that come from a relationship with somebody who has a lot of experience</u>." Id. at 212 (emphasis added). Dr. Schleicher described Adams's involvement with Movant "as more like an addiction. I'm not sure that you would call what he felt love, as much as need, because he felt so filled up and she was like a drug that filled him up and <u>she was tantalizing him by being so far away but just leading him on</u>." Id. at 213-214 (emphasis added). After testing, Dr. Schleicher considered Adams to be "a truthful, honest guy" and "very honest." Id. at pp. 191, 192.

In 1997, when Adams was receiving letters from Movant, a military psychologist in Bahrain, Saudi Arabia treated Adams and recommended that he be evaluated for anxiety, compulsiveness, and depression. Id. at pp. 182-83. During that same period, a non-commissioned officer's evaluation found Adams to have "demonstrated questionable judgment." Id. at pp. 216-17. Dr. Schleicher agreed with that psychologist that Adams needed monthly

4

counseling, but did not agree that Adams needed medication and weekly counseling. Id. at 203.

Movant's trial was held on November 27 through 29, 2001. Neither prior to nor after Movant's trial was the Government or defense counsel aware of Dr. Schliecher's testimony at Adams's sentencing until some time prior to the evidentiary hearing in this action.

Tom Watson, Movant's trial counsel, did not secure Dr. Schleicher's testimony for trial. (TR at p. 12). Watson opined that this information about Adams would have been "helpful both in preparing my theory and defense and also in attacking the theory propounded by Mr. Adams." Id. Watson's assessment was that Dr. Schleicher's report established that "basically . . . [Adams] lived kind of in a fantasy world that he - while cognizant of reality, he made up scenarios in his mind and kind of relied upon those and sort of lived as if many of those scenarios were real." Id. at pp. 12-13. Watson could not "figure out why [he] didn't" secure Dr. Schleicher's testimony. Id. at p. 15.

Watson was aware that Adams's sentencing had been completed prior to Movant's trial, id. at p. 23 and that Adams was cooperating with the Government. Id. at p. 24. Watson had regular contact with Mike Love, one of Adams' attorneys in the military proceeding and discussed Movant's and Adams's cases. (TR at p. 9). Watson knew several JAG officers at Fort Campbell and believed that he could have obtained the sentencing documents from one of them, but did not know why he did not do so. Id. at p. 17. Watson did not recall attempting to obtain Adams' sentencing documents from Robert Washko, the Assistant United States Attorney for Movant's prosecution. Id. at pp. 15-16. Watson conceded that he could have obtained Dr. Schleicher's testimony through the Freedom of Information Act or requested the materials from Love. Id.

5

According to Watson, the trial defense was that Movant was not an abused spouse, but was abused by Adams. Id. at p. 23. Movant's insistence of this fact precluded any battered woman defense. Id. at p. 29. Yet, photographs of Movant that Adams took, were ""very incriminating," particularly when coupled with Movant's letters to Adams and tapes of their conversations. Id. at p. 32. Watson's personal belief was that Movant had been abused by her husband, id. at p. 34, but Movant "was adamant that she was not a battered spouse and had only been abused by, rather Adams." Id. at p. 33.

Robert Washko, the Assistant United States Attorney in Movant's prosecution and former military prosecutor, described his open file policy for his criminal prosecutions, including producing 302 reports of FBI agents. Id. at p. 41-42. Washko's letter to Watson in February 2001 confirms this disclosure to Watson. Government's Exhibit No. 1. Watson agreed that Washko gave him everything in his files. Id. at pp. 27-28. Washko was aware of Adam's guilty plea, but became aware of Adams's stipulation of the facts in the military proceedings and Dr. Schleicher's sentencing testimony in this proceeding. Id. at p. 39. Washko is aware that military records are public records. Id. at p. 38. Washko did not have an independent recollection of his contact with the military prosecutor. Id. at p. 40. Washko was aware of Adams's guilty plea and sentencing. Id. at p. 41.

In Washko's opinion, the Government probably could have convicted Movant without Adams's testimony, given his status as a co-conspirator that would have allowed all of his statements to Movant and others to be admissible. Id. at pp. 52-53. After examining Dr. Schleicher's testimony in this proceeding about Adams's personality disorder, Washko did not consider her testimony to be impeachment material. Id. at p. 63. Yet, Washko agreed that if he

6

had known of Dr. Schleicher's sentencing testimony before Movant's trial, then he would have produced them to Watson. Id. at pp. 41-42.

## B. Conclusions of Law

As to Movant's ineffective assistance of counsel claim, the Sixth Circuit summarized Supreme Court precedents and identified two broad categories of ineffective assistance of counsel claims: (1) the actual or effective absence of counsel at a critical stage of the proceeding for which a presumption of prejudice arises; and (2) counsel whose performance was deficient on specific issues and that deficiency was demonstrably prejudicial to the defendant. As the Sixth Circuit explained:

> In Cronic[1], the Supreme Court held that an appeals court must reverse a criminal defendant's conviction "without any specific showing of prejudice to defendant when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding." . . . In Williams[2], the Supreme Court confirmed the vitality of this "per se" approach, noting that while the Strickland v. Washington, 466 U.S. 668 (1984), test for ineffective assistance of counsel, requiring proof of deficient performance and prejudice, provides guidance for resolving virtually all ineffective assistance of counsel claims, there are "a few situations in which prejudice may be presumed."

Mitchell v. Mason, 325 F.3d 732, 740 (6th Cir. 2003) (citations and parenthetical omitted).

Within the first category are three types of cases warranting the presumption of prejudice arising from counsel's acts or omissions:

> The first is the complete denial of counsel, in which "the accused is denied the presence of counsel at 'a critical stage.'" Bell, 122 S.Ct. at 1851 (quoting Cronic, 466 U.S. at 659). The second is when counsel "'entirely fails to subject the prosecution's case to meaningful adversarial testing.'" Id. (quoting Cronic, 466 U.S. at 659). The third is when counsel is placed in circumstances in which competent counsel very likely could

---

[1] United States v. Cronic, 466 U.S. 648 (1984)

[2] Williams v. Taylor, 529 U.S. 362 (2000).

not render assistance.

Id. at 742.

Given Movant's insistence about her relationship with Adams, Movant's claim does not fall within any of these categories and thus, a "strong presumption" arises that Movant's trial counsel provided reasonably effective assistance. Strickland, 466 U.S. at 689. Thus, Movant must show that her trial "counsel made errors so serious that counsel was not functioning as the counsel guaranteed by the Sixth Amendment and that the deficient performance prejudiced the defense and deprived the defendant of a fair trial whose result is reliable." Strickland, 466 U.S. 687.

As applied here, given Watson's awareness of Adam's cooperation with the Government, effective assistance would have required Watson to obtain all of Adams's prior statements, particularly at his guilty plea and sentencing on the same offense as well as his military records. Adams's sentencing records in his military proceeding are public records that were available to Watson. Thus, Watson's failure to secure them constitute ineffective assistance of counsel.

As to the prejudice component, Dr. Schleicher's testimony is a dual edge sword. To be sure, Dr. Schleicher identifies Adams's personality disorder, but Dr. Schleicher also considered Adams to be able to discern right from wrong and to be a "very honest person." Significantly, Dr. Schleicher clearly considered Movant to have "manipulated" Adams as a more experienced person in such matters. This testimony would have been devastating to Movant's defense that Adams raped her. Dr. Schleicher's testimony would have offered further damaging and incriminating support to Movant's romantic letters to Adams and their recorded conversations as well as to provide an understanding of Movant's provocative photographs. For these reasons, the

8

Court concludes that Movant was not prejudiced by Watson's failure to secure Dr. Schleicher's testimony at Adams's sentencing or Adams's other military records for Movant's trial.

As to Movant's <u>Brady</u> claim for the Government's failure to produce Dr. Schleicher's testimony at her trial, in <u>Brady</u>, the Supreme Court held that the government is required to disclose to the defendant evidence in its possession that is both favorable to the accused and material to guilt or punishment. "We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87. In <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985), the Supreme Court extended <u>Brady</u>: "Impeachment evidence, however, as well as exculpatory evidence, falls within the <u>Brady</u> rule."

In <u>Kyles v. Whitley</u>, 514 U.S. 419 (1995), the Supreme Court reiterated that <u>Brady</u> materials require disclosure of impeachment evidence, without a request from the defendant.

> [In <u>Bagley</u>], the Court disavowed any difference between exculpatory and impeachment evidence for <u>Brady</u> purposes, and it abandoned the distinction between the second and third <u>Agurs</u> circumstances, i.e., the "specific-request" and "general- or no-request" situations. <u>Bagley</u> held that regardless of request, favorable evidence is material, and constitutional error results from its suppression by the government, "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

<u>Id.</u> at 433 (quoting <u>Bagley</u>, 473 U.S. at 682, 685).

Later, the Supreme Court restated the elements of a <u>Brady</u> violation. "There are three components of a true <u>Brady</u> violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been

9

suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." Strickler v. Greene, 527 U.S. 263, 281-82 (1999). In sum, for his Brady claim, Petitioner must show: "(1) that the evidence was favorable to him; (2) that it was suppressed (whether intentionally or not); and (3) that prejudice ensued." Jamison v. Collins, 291 F.3d 380, 385 (6th Cir. 2002).

Brady's disclosure duty extends to exculpatory or impeachment evidence that is known only to investigating agents or officers assigned to the prosecution team. As the Supreme Court stated in Kyles:

> **The State of Louisiana** would prefer an even more lenient rule. It pleads that some of the favorable evidence in issue here was not disclosed even to the prosecutor until after trial, Brief for Respondent 25, 27, 30, 31, and it **suggested below that it should not be held accountable under Bagley and Brady for evidence known only to police investigators and not to the prosecutor. [FN]**
>
>> [FN] **The State's counsel retreated from this suggestion at oral argument, conceding that the State is "held to a disclosure standard based on what all State officers at the time knew." Tr. Of Oral Arg. 40.**
>
> **To accommodate the State in this manner would, however, amount to a serious change of course from the Brady line of cases. In the State's favor it may be said that no one doubts that police investigators sometimes fail to inform a prosecutor of all they know. But neither is there any serious doubt that 'procedures and regulations can be established to carry [the prosecutor's] burden and to insure communication of all relevant information on each case to every lawyer who deals with it'.**

514 U.S. at 438 (quoting Giglio v. United States, 405 U.S. 150, 154 (1972)) (emphasis added).

In Strickler, the Supreme Court again reiterated that "the [Brady] rule encompasses evidence 'known only to police investigators and not the prosecutor.' In order to comply with Brady, therefore, **the individual prosecutor has a duty to learn of any favorable evidence**

10

**known to the others acting on the government's behalf in this case, including the police.'"** 527 U.S. at 280-81 (quoting Kyles, 514 U.S. at 437, 438) (emphasis added). This duty is based upon "the special role played by the American prosecutor in the search for truth in criminal trials." Id. at 281. )

Yet, in Bell v. Bell, 512 F.3d 223, 230 (6th Cir. 2008) (en banc) where the prosecution withheld a witness's sentencing records that "tended to prove that [the witness] was seeking favors from the government in exchange for his testimony," the Sixth Circuit held that the sentencing records were not Brady information because this information was "'reasonably available to' the petitioner or his counsel from another source," Id. at 235 (citations omitted). Here, the testimony and Movant's exhibits reflect that Dr. Schleicher's testimony was publicly unavailable and under Bell, Movant has not established a Brady violation.

As to Movant's re-sentencing claim under Booker, that the United States Sentencing Guidelines are advisory rather than mandatory, in Valentine v. United States, 488 F.3d 325 (6th Cir. 2007), the Sixth Circuit held that Booker does not permit a collateral attack of a pre-Booker sentence. Although Movant argues that Valentine is fundamentally flawed in holding that Booker, is a "new rule" of criminal procedure, citing Schriro v. Summerlin, 542 U.S. 348, 352 (2004), Valentine is binding on this Court as Valentine was decided after Schriro and discusses and analyzes Schriro. Valentine, 488 F.3d at 328, 331, 347 n. 10.

11

For these collective reasons, Movant's motion to vacate must be denied.

An appropriate Order is filed herewith.

**ENTERED** this the ___24th___ day of June, 2009.

                                              WILLIAM J. HAYNES, JR.
                                              United States District Judge